# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILDEARTH GUARDIANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID BERNHARDT, in his | ) | |
| official capacity as Secretary of the | ) | Case No. 20-1035 (CKK) |
| U.S. Department of the Interior, | ) | |
| AURELIA SKIPWITH, in her | ) | |
| official capacity as Director of the | ) | |
| U.S. Fish and Wildlife Service, and | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
# DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND
# IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ....................................................................................... i

TABLE OF AUTHORITIES ............................................................................... iii

TABLE OF EXHIBITS ....................................................................................... ix

INTRODUCTION ............................................................................................... 1

STATUTORY AND REGULATORY FRAMEWORK..................................... 2

    I.   The Endangered Species Act............................................................. 2

        A.  Listing Petitions and Petition Findings......................................... 3

        B.  Candidate Species ....................................................................... 5

    II.  The Service's National Workplan For Listing Petitions........................ 6

FACTUAL BACKGROUND ............................................................................... 8

    I.   The Service Has Made Positive 90-Day Findings For Each Species At Issue In This Action, But Has Not Yet Issued 12-Month Findings. ................................. 8

    II.  The Service Is Diligently Working Toward Completing Listing Determinations In Accordance With Its National Listing Workplan. ................... 9

LEGAL STANDARD ......................................................................................... 9

ARGUMENT ....................................................................................................... 10

    I.   The Court Has Discretion To Fashion Equitable Injunctive Relief. ..................... 11

        A.  Courts have broad discretion when an agency fails to act by a statutory deadline............................................................................. 11

        B.  The ESA does not constrain the Court's discretion. ....................... 12

    II.  The Remedy Proposed By The Service Best Preserves The Benefits Of Its Workplan And Best Serves The ESA's Conservation Goals. ......................... 13

        A.  The Service's Workplan advances the conservation goals of the ESA............ 13

        B.  Plaintiff's proposed remedy undermines the conservation goals of the Service's Workplan and the ESA. ................................................. 16

i

Page

C.   As articulated in *Train*, courts recognize that it may be infeasible for
       the Service to comply with a statutory listing deadline. .................................. 18

D.   The Court has discretion to set a feasible remedy that preserves the
       Workplan's schedule and its ordering of priorities. ........................................ 20

E.   The Service is not delaying 12-month findings because of recent
       regulatory changes. ...................................................................................... 21

III.   The Service Cannot Disregard Congressionally Imposed Appropriations Caps. .... 22

A.   Congress places annual caps on the Service's ESA listing program. .............. 22

B.   The Service expends funds on the ESA listing program in accordance
       with Congress's direction. .............................................................................. 24

C.   Plaintiff's attempt to use this court's equitable powers to circumvent
       the listing program's spending cap should be rejected. .................................. 25

IV.   The Court Should Defer to the Service's Proposed Compliance Deadline. ........... 27

A.   Plaintiff overstates the urgency for 12-month findings for the four
       freshwater aquatic species here. .................................................................... 27

B.   Deference to an agency's proposed compliance deadline is appropriate
       where, as here, the service has been diligent. ................................................ 29

CONCLUSION ....................................................................................................... 31

## **TABLE OF AUTHORITIES**

Cases                                                                                                      Page(s)

*Adams v. United States*,
    141 Fed. Cl. 428 (2019) ........................................................................................23

*Am. Bioscience v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ...............................................................................10

*Am. Lung Ass'n v. Browner*,
    884 F. Supp. 345 (D. Ariz. 1994) .............................................................................11

*Am. Lands Alliance v. Norton*,
    242 F. Supp. 2d 1 ............................................................................................... 19, 20

*Andrus v. Sierra Club*,
    442 U.S. 347 (1979)..................................................................................................22

*Bennett v. Spear*,
    520 U.S. 154 (1997)..................................................................................................10

*Biodiversity Legal Found. v. Babbitt*,
    63 F. Supp. 2d 31 (D.D.C. 1999) .............................................................................20

*Biodiversity Legal Found. v. Babbitt*,
    146 F.3d 1249 (10th Cir.1998) ............................................................................ 18, 19

*Bloch v. Powell*,
    227 F. Supp. 2d 25 (D.D.C. 2002) ...........................................................................10

*Cal. Native Plant Soc'y v. Norton*, No. Civ. A. 03-1540 (JR),
    2005 WL 768444 (D.D.C. Mar. 24, 2005) ...............................................................18

*Cincinnati Soap Co. v. United States*,
    301 U.S. 308 (1937)..................................................................................................22

*Colo. River Cutthroat Trout v. Kempthorne*,
    448 F. Supp. 2d 170 (D.D.C. 2006).........................................................................13

*Contoski v. Scarlett*, No. 05-2528 (JRT/RLE),
    2006 WL 2331180 (D. Minn. Aug. 10, 2006) ..........................................................13

*Coos Cty. Bd. of Cnty. Comm'rs v. Kempthorne*,
    531 F.3d 792 (9th Cir. 2008) ...................................................................................18

<u>Cases, continued</u>                                                     <u>Page(s)</u>

*Cronin v. Browner*,
    90 F. Supp. 2d 364 (S.D.N.Y. 2000) ........................................................12

*Ctr. for Biological Diversity v. BLM*, No. C 03-2509 SI,
    2006 WL 2788252 (N.D. Cal. Sept. 26, 2006) ........................................13

*Ctr. for Biological Diversity v. Norton*, No. 01-CV-2101-IEGLAB,
    2003 WL 22225620 (S.D. Cal. Sept. 9, 2003) ........................................13

*Defs. of Wildlife v. Norton*,,
    239 F. Supp. 2d 9 (D.D.C. 2002) ............................................................13

*\*Dolan v. United States*,
    560 U.S. 605 (2010).......................................................................... 12, 13

*Env't Def. Ctr. v. Babbitt*,
    73 F.3d 867, 872 (9th Cir.1995) ..............................................................19

*Friends of Wild Swan v. U. S. Fish & Wildlife Serv.*,
    945 F. Supp. 1388 (D. Or. 1996)..............................................................18

*Fund for Animals v. Babbitt*,
    903 F. Supp. 96 (D.D.C. 1995) ................................................................10

*Greater Yellowstone Coal. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011) .................................................................10

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944).................................................................................29

*\*In re Barr Labs.*,
    930 F.2d 72 (D.C. Cir. 1991) ............................................................ 11, 20

*In re Monroe Commc'ns Corp.*,
    840 F.2d 942 (D.C. Cir. 1988) ................................................................20

*In re Sw. Rsch. & Info. Ctr.*, No. 95-1285,
    1995 WL 495948 (D.C. Cir. Aug. 14, 1995) ..........................................11

*INS v. Pangilinan*,
    486 U.S. 875 (1988)................................................................................26

*Las Vegas v. Lujan*,
    891 F.2d 927 (D.C.Cir.1989) .................................................................10

<u>Cases, continued</u>                                                    <u>Page(s)</u>

*Lincoln v. Vigil,*
    508 U.S. 182 (1993).................................................................25

*Maine Ass'n of Handicapped Persons v. Dole,*
    623 F. Supp. 920 (D. Me. 1985)............................................12

*Mylan Pharms. v. Shalala,*
    81 F. Supp. 2d 30 (D.D.C. 2000) .........................................11

*\*Nat. Res. Def. Council v. Train ("Train"),*
    510 F.2d 692 (D.C. Cir. 1975) .......................................passim

*Nevada v. Dep't of Energy,*
    400 F.3d 9 (D.C. Cir. 2005)...................................................25

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ...............................................................10

*Off. of Pers. Mgmt. v. Richmond,*
    496 U.S. 414 (1990)........................................................22, 26

*Salazar v. Ramah Navajo Chapter,*
    567 U.S. 182 (2012)..............................................................23

*Sierra Club v. Thomas,*
    658 F. Supp. 165 (N.D. Cal. 1987)......................................11

*Sierra Club v. Thomas,*
    828 F.2d 783 (D.C. Cir. 1987) .............................................12

*Telecomms. Rsch. Action Ctr. v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984) ...............................................20

*Tennessee Valley Auth. (TVA) v. Hill,*
    437 U.S. 153 (1978)...................................................13, 14, 22

*United States House of Representatives v. Burwell,*
    130 F. Supp. 3d 53 (D.D.C. 2015) .......................................22

*United States v. Dickerson,*
    310 U.S. 554 (1940).............................................................23

*United States v. Oakland Cannabis Buyers' Coop.,*
    532 U.S. 483 (2001)..............................................................12

Cases, continued                                                                Page(s)

*United States v. Will*,
    449 U.S. 200 (1980)...................................................................................23

*United Steelworkers of Am. v. Rubber Mfrs. Ass'n*,
    783 F.2d 1117 (D.C. Cir. 1986) ...............................................................12

*W. Coal Traffic League v. Surface Transp. Bd.*,
    216 F.3d 1168 (D.C. Cir. 2000) ...............................................................11

*W. Watersheds Project v. Norton*, No. CV 06-00127-S-EJL,
    2007 WL 2827375 (D. Idaho Sept. 26, 2007).........................................27

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)...................................................................................11


Constitution, Statutes, and Public Law

U.S. Const. art. I, § 9, cl. 7...................................................................................22

5 U.S.C. § 701 ........................................................................................................ 3
5 U.S.C. § 706 ........................................................................................................ 9
5 U.S.C. § 706(1) ..................................................................................................10
16 U.S.C. § 1531(b) .........................................................................................2, 13
16 U.S.C. § 1532(6) ............................................................................................... 2
16 U.S.C. § 1532(20)............................................................................................. 2
16 U.S.C. § 1533(b)(3)(A) .................................................................................... 3
16 U.S.C. § 1533(b)(3)(B)...........................................................................4, 5, 10
16 U.S.C. § 1533(b)(4) .......................................................................................... 3
16 U.S.C. § 1533(b)(7) ...................................................................................4, 28
16 U.S.C. § 1533(h) .............................................................................................19
16 U.S.C. § 1533(h)(3) .......................................................................................... 5
16 U.S.C. § 1540(g) ............................................................................................... 9
16 U.S.C. § 1540(g)(1)(C) ........................................................................... 10, 12
16 U.S.C. § 1540(g)(5) .........................................................................................13

*Further Consolidated Appropriations Act, 2020*, Pub. .L. No. 116-94,
    133 Stat. 2534, 2689 (2019)......................................................................24
*Omnibus Consolidated Appropriations*, Pub. L. No. 105-277,
    112 Stat. 2681 (1998)................................................................................23
*Dep't of the Interior and Related Agencies Appropriations Act, 1998*, Pub. L. No. 105-83,
    11 Stat. 1543, 1547 (1997) .......................................................................23

Regulations                                                                 Page(s)

50 C.F.R. § 424.14(a) ................................................................... 3
50 C.F.R. § 424.14(b) (2016) ...................................................... 3
50 C.F.R. § 424.14(h)(1) ............................................................. 3
50 C.F.R. § 424.14(h)(i) .............................................................. 3
50 C.F.R. § 424.20(a) ..................................................................28


Legislative Materials

H.R. Rep. No. 97-835 (1982) ................................................passim
H.R. Rep. No. 105-337 (1997).....................................................24
H.R. Rep. No. 105-825 (1998).....................................................24


Other Authorities

*Endangered and Threatened Species Listing and Recovery Priority Guidelines*,
    48 Fed. Reg. 43,098 (Sept. 21, 1983) ........................................... 6

*Endangered and Threatened Wildlife and Plants; 12-month Finding for a Petition To List the
    Sicklefin Chub (Macrhybopsis meeki) and the Sturgeon Chub (Macrhybopsis gelida) as
    Endangered*, 66 Fed. Reg. 19,910 (Apr. 18, 2001) .......................................28

*2010 Candidate Notice of Review*,
    75 Fed. Reg. 69,222, 69,224 (Nov. 10, 2010)....................................... 14, 15

*Draft Methodology for Prioritizing Status Reviews and Accompanying 12-Month Findings
    on Petitions for Listing Under the Endangered Species Act*, 81 Fed. Reg. 2,229
    (Jan. 15, 2016) ................................................................... 6

*Endangered and Threatened Wildlife and Plants; 90-Day Findings on 29 Petitions*,
    81 Fed. Reg. 14,058, 14,069 (Mar. 16, 2016) ................................. 8

*\*Methodology for Prioritizing Status Reviews and Accompanying 12-Month Findings on
    Petitions for Listing under the Endangered Species Act*, 81 Fed. Reg. 49,248
    (July 27, 2016) .....................................................................6, 7, 19

*Endangered and Threatened Wildlife and Plants; 90-Day Findings for Five Species*,
    82 Fed. Reg. 60,362 (Dec. 20, 2017) ......................................... 8

*Endangered and Threatened Wildlife and Plants; Regulations for Listing Species and Designating
    Critical Habitat*, 84 Fed. Reg. 45,020 (Aug. 27, 2019) ...................................21

Other Authorities, cont.                                                    Page(s)

*2019 Candidate Notice of Review,*
    84 Fed. Reg. 54,732, 54,734 (Oct. 10, 2019) ...............................................................15

Benjamin Jesup, *Endless War or End this War? The History of Deadline Litigation*
    *Under Section 4 of the Endangered Species Act and the Multi-District Litigation*
    *Settlements*, 14 Vt. J. Env't L. 327, 341 (2013) ................................................... 6, 24, 25

## TABLE OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | November 16, 2020 Declaration of G. Frazer ("Frazer Decl.") |
| B | November 16, 2020 Declaration of D. Becker ("Becker Decl.") |
| C | November 16, 2020 Declaration of S. Sartorius ("Sartorius Decl.") |
| D | Excerpts from Appropriations Legislation for F2014 through FY2020 |

## **INTRODUCTION**

This case is not about liability. The U.S. Fish and Wildlife Service (the "Service") does not contest that it has a non-discretionary obligation to make a determination within 12 months of receiving Plaintiff's petitions whether the listing of four freshwater aquatic species (the Rio Grande chub (*Gila pandora*), the Rio Grande sucker (*Catostomus plebeius*), the sturgeon chub (*Macrhybopsis gelida*), and the sicklefin chub (*Macrhybopsis meeki*)) as threatened or endangered species under the Endangered Species Act ("ESA") is warranted, not warranted, or warranted but precluded (a determination known as a "12-month finding").[1] Plaintiff's petitions were submitted more than 12-months before the filing of this suit, and the Service has not yet made 12-month findings for the species at issue here.

This case is about the remedy that the Court should impose on the Service for violating the statutory deadline. The most effective and practicable remedy—and the remedy that would best advance the conservation purposes of the ESA—would be one that allows sufficient time for the Service to make a scientifically defensible 12-month finding for each species without delaying protections for more imperiled species or sabotaging the Service's efforts to achieve the conservation purposes of the ESA as effectively and efficiently as possible. The Court should therefore put in place a reasonable and feasible deadline that takes these factors into account. The Court has broad equitable discretion in fashioning such a remedy. With this in mind, and given the present and anticipated funding levels of the ESA listing program (which are, of course, set by Congress), the Service's current and extensive Workplan, and the Service's overall ESA workload, the Court should order the Service to submit 12-month findings to the Office of the Federal Register for the sicklefin and sturgeon chubs on or before September 30, 2023, and 12-month findings for the Rio Grande chub and sucker on or before June 14, 2024.

---

[1] The case originally involved five aquatic species, but the parties resolved their dispute regarding one species, the narrow-foot hygrotus diving beetle (*Hygrotus diversipes*). *See* Joint Motion, ECF No. 19, at 1-2.

Plaintiff's requested remedy—requiring the Service to complete and publish the 12-month findings within nine months of the close of briefing—is simply infeasible. To complete the 12-month finding for each species, the Service must: (1) conduct its status reviews by researching and gathering scientific and commercial data and analyzing each species' biological status; (2) apply statutory and regulatory standards to evaluate whether listing is warranted; (3) draft up to four separate 12-month findings that are based on the best scientific and commercial data available; and (4) obtain management, legal, and Departmental reviews. Even if the Service could complete the findings in a few months (it cannot), Plaintiff's proposed remedy would require setting back other listing obligations already in the queue that the Service has determined to have a higher priority than the four species at issue here. Plaintiff's proposed remedy would also undermine the Service's comprehensive Workplan and the broader conservation purposes that ESA listing deadlines are meant to promote.

For these reasons, only the remedy proposed by the Service offers Defendants sufficient latitude to integrate these additional demands into an already taxing workload with funding levels provided by Congress, maintains balance in the Service's ESA listing program, and allows the Service the time to complete thorough and defensible 12-month findings based on the best available scientific and commercial data.

## STATUTORY AND REGULATORY FRAMEWORK

### I.     The Endangered Species Act

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).[2] Section 4 of the ESA directs the Secretaries of the Interior and Commerce to

---

[2] An "endangered species" is defined by the statute as "any species which is in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and a "threatened species" is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," *id.* § 1532(20).

determine whether a particular species should be listed as "threatened" or "endangered," *id.* § 1533(a)(1), and to designate "critical habitat" for listed species to the maximum extent prudent and determinable, *id.* § 1533(a)(3)(A)(i).[3]

## A.    Listing Petitions and Petition Findings

In the normal course, the Secretary lists a species by promulgating a regulation after undertaking formal rulemaking pursuant to the procedures set forth in the ESA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; *see also* 16 U.S.C. § 1533(b)(4). A listing decision begins when either the Secretary initiates one or an "interested person" petitions the Secretary to list a species as threatened or endangered. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a). If the Secretary receives a petition, "[t]o the maximum extent practicable, within 90 days after receiving [the] petition," the Service must "make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted" (that is, a "90-day finding"). 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(h)(1). The Service's standard for making such a 90-day finding is whether the petition provides "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition [i.e., listing] may be warranted." 50 C.F.R. § 424.14(b) (2016).[4]

If the Service concludes in its 90-day finding that the action requested in the petition may be warranted, then it must "promptly commence a review of the status of the species concerned." 16 U.S.C. § 1533(b)(3)(A). The statute requires that, "[w]ithin 12 months after receiving a petition . . . present[ing] substantial information," that listing may be warranted, the Service must make a finding that the petitioned action is: (a) warranted; (b) not warranted;

---

[3] The Secretary of the Interior, acting through the Service, is responsible for actions concerning the five aquatic species identified in the complaint. References to "Secretary" in this brief refer to the Secretary of the Interior.

[4] The Service revised the regulatory definition of "substantial scientific or commercial information" in 2019, *see* 50 C.F.R. § 424.14(h)(i), but the Service made the 90-day findings for the petitions at issue in this case under the old regulation.

or (c) warranted but further action is precluded by other pending listing proposals and expeditious progress is being made to list and delist species (referred to as a "warranted but precluded" finding). *Id.* § 1533(b)(3)(B).

The 12-month finding must be made "solely on the basis of the best scientific and commercial data available to [the Secretary] after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation . . . to protect [the] species." *Id.* § 1533(b)(1)(A). The status review leading to the 12-month finding considers whether listing is warranted because of any of five statutory factors:

(A) the present or threatened destruction, modification, or curtailment of [the species'] habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(1). If the Service's 12-month finding is that listing is "not warranted," the listing process terminates. If the 12-month finding is that listing is "warranted," the Secretary must promptly publish a rule proposing the listing of the species. *Id.* § 1533(b)(3)(B)(ii). If the Service's 12-month finding is that listing is "warranted but precluded," the Service considers the species a "candidate species," which are discussed in more detail below.

In situations where there exists an "emergency posing a significant risk to the well-being of any species of fish or wildlife or plants," the ESA authorizes the Secretary to bypass the normal rulemaking procedures and issue regulations, including a listing, that take effect, at the discretion of the Secretary, immediately upon publication in the Federal Register. *Id.* § 1533(b)(7). The ESA expressly provides that emergency listing determinations and regulations are temporary and remain in effect only for 240 days, unless the Service thereafter

follows the procedures for a conventional listing (*i.e.*, the rulemaking procedures set forth in the ESA and the APA) and issues a new regulation within the 240-day period. *Id.* If, at any time after issuing an emergency regulation, the Secretary "determines, on the basis of the best appropriate data available to him, that substantial evidence does not exist to warrant such regulation," that the Secretary must withdraw the emergency listing regulation. *Id.*

### B.    Candidate Species

When the Service's 12-month finding is that listing is "warranted but precluded," the procedures are different. First, to find that a petitioned action is "warranted but precluded," the Secretary must conclude that, although listing the species is warranted, "the immediate proposal and timely promulgation of a final regulation implementing the petitioned action . . . is precluded by pending proposals to determine whether any species is an endangered species or a threatened species." *Id.* § 1533(b)(3)(B)(iii)(I); 50 C.F.R. § 424.14(h)(2)(iii)(A). The Service must also find that "expeditious progress is being made to add qualified species" to the lists of threatened and endangered species, and to remove species that are no longer qualified. *Id.* § 1533(b)(3)(B)(iii)(II); 50 C.F.R. § 424.14(h)(2)(iii)(B).

Second, a "warranted but precluded" finding means that the Service will not immediately begin to develop a proposed rule to add that species to the lists of threatened and endangered species. Species whose listing has been found to be warranted-but-precluded are "candidate species." In recognition that the Service has no control over the workload created by citizen petitions, Congress drafted the ESA to allow for a "warranted-but-precluded" finding if a species warrants listing but that listing is precluded by higher-priority listing actions. *See id.* § 1533(b)(3)(B). The Service is required to document its "expeditious progress" in addressing candidate species, and Congress has also directed the Service to "utilize a scientifically based priority system to list and delist species, subspecies and populations based on the degree of threat, and proceed in an efficient and timely manner." H.R. Rep. No. 97-835, at 21 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 2860, 2862; *see also* 16 U.S.C. § 1533(h)(3).

The priority system that the Service adopted for candidate species in response to this mandate ranks the candidate species according to: (1) the magnitude of threats they face; (2) the immediacy of those threats; and (3) the taxonomic distinctiveness of the entity that may be listed. Listing priority numbers range from 1 (highest priority) to 12 (lowest priority). *See Endangered and Threatened Species Listing and Recovery Priority Guidelines*, 48 Fed. Reg. 43,098, 43,102-03 (Sept. 21, 1983). The guidelines are meant to prioritize listing actions "in order to make the most appropriate use of the limited resources available to implement" the ESA, so the Service assigns species listing priority numbers in the process of completing 12-month findings. *Id.* at 43,098.

## II.     The Service's National Workplan For Listing Petitions

The Service has also developed a priority system for addressing listing petitions. Historically, the Service has received many more petitions to list, delist, or reclassify species than the resources necessary to implement the ESA, thereby leading to a backlog of outstanding listing determinations.[5] To address this backlog, the Service developed, through a notice and comment process, a methodology for prioritizing work on status reviews and petition findings. *Methodology for Prioritizing Status Reviews and Accompanying 12-Month Findings on Petitions for Listing under the Endangered Species Act*, 81 Fed. Reg. 49,248 (July 27, 2016) ("Prioritization Methodology"). The Service began developing the Prioritization Methodology in 2015 and published notice of the process in early 2016. Exh. A, Nov. 16, 2020 Declaration of G. Frazer ("Frazer Decl.") ¶¶ 14-15; *see also Draft Methodology for Prioritizing Status Reviews and Accompanying 12-Month Findings on Petitions for Listing Under the Endangered Species Act*, 81 Fed. Reg. 2,229 (Jan. 15, 2016).

---

[5] Benjamin Jesup, *Endless War or End this War? The History of Deadline Litigation Under Section 4 of the Endangered Species Act and the Multi-District Litigation Settlements*, 14 Vt. J. Env't L. 327, 341 (2013) (explaining that, the Service's "budget for the listing program has never been sufficient to address the entire backlog" of petitions).

Under the Prioritization Methodology, the Service assigns each 12-month finding to one of five priority bins: (1) The species is critically imperiled; (2) strong data are already available about the status of the species; (3) new science is underway that would inform key uncertainties about the status of the species; (4) conservation efforts are in development or underway and likely to affect the status of the species; or (5) the available data on the species are limited. Frazer Decl. ¶ 17. Unless otherwise warranted, within each of the Service's geographic regions, 12-month findings with lower bin numbers have a higher priority than, and are scheduled before, 12-month findings with higher bin numbers. *See* Frazer Decl. ¶ 17.

Since adopting the Prioritization Methodology, the Service has developed a comprehensive National Listing Workplan (the "Workplan") that addresses the backlog of outstanding listing determinations. When developing the Workplan, the Service applied the Prioritization Methodology, but the Service also considered other factors, such as the "annual available funding, staffing resources, nondiscretionary requirements such as court orders and settlement-agreement requirements, and the listing priority numbers of existing candidate species." 81 Fed. Reg. 49,250. The Service published its first Workplan in September 2016. Frazer Decl. ¶ 16; *see also* Plaintiff's Motion for Summary Judgment ("Pls. Mot."), Exh. 8 (the "2016 Workplan"). The current Workplan, which was published in May 2019, prioritizes the Service's work on more than 220 outstanding petitions, which includes 12-month findings, listing determinations, and critical habitat determinations and discretionary listing actions for non-petitioned species over a five-year period from FY2019 until FY2023. Frazer Decl. ¶ 19-20; *see also* FWS_0001 to FWS_0020 (the "current Workplan").[6]

The Workplan enables the Service to prioritize its workload based on the needs of candidate and petitioned species, while providing greater clarity and predictability about the

---

[6] Citations to "FWS_XXXX" in this memorandum are to documents that are contained in the administrative record, which was served on Plaintiff on September 16, 2020. *See* Notice, ECF No. 18 at 1. In accordance with Local Civil Rule 7(n), Defendants will work with Plaintiff to prepare a joint appendix containing the parts of the administrative record cited in the parties' briefs following the close of briefing.

time of listing determinations to state wildlife agencies, nonprofit organizations, and other diverse stakeholders and partners, with the goal of encouraging proactive conservation so that federal protections are not needed in the first place. Frazer Decl. ¶ 18-19.

## FACTUAL BACKGROUND

I.   **The Service Has Made Positive 90-Day Findings For Each Species At Issue In This Action, But Has Not Yet Issued 12-Month Findings.**

The Service received Plaintiff's petitions to list the Rio Grande chub on September 27, 2013, the Rio Grande sucker on October 2, 2014, and the sicklefin and sturgeon chubs on August 15, 2016. *See* Exh. B, Nov. 13, 2020 Declaration of D. Becker ("Becker Decl.") ¶ 6; Exh. C, Nov. 13, 2020 Declaration of S. Sartorius ("Sartorius Decl.") ¶ 5; *see also* FWS_0028 to FWS_0048 (Petition to list the Rio Grande chub); FWS_0074 to FWS_0117 (Petition to list the Rio Grande sucker); FWS_0147 to FWS_0217 (Petition to list the sicklefin and sturgeon chubs). None of Plaintiff's petitions requested an emergency listing determination. Becker Decl. ¶ 6; Sartorius Decl. ¶ 5. The Service published positive 90-day findings for the petitions to list the Rio Grande chub and sucker on March 16, 2016, and for the petition to list the sicklefin and sturgeon chubs on December 20, 2017. Becker Decl. ¶ 6; Sartorius Decl. ¶ 5; *see also Endangered and Threatened Wildlife and Plants; 90-Day Findings on 29 Petitions*, 81 Fed. Reg. 14,058, 14,069 (Mar. 16, 2016) (90-day findings for the Rio Grande chub and sucker); *Endangered and Threatened Wildlife and Plants; 90-Day Findings for Five Species*, 82 Fed. Reg. 60,362, 60,364 (Dec. 20, 2017) (90-Day findings for the sicklefin and sturgeon chubs). The Service has not yet made 12-month findings for the species at issue here. *See* Answer, ECF No. 13, ¶¶ 34, 45, 52 (admitting Defendants have not completed 12-month findings).[7]

---

[7] On December 9, 2019, Defendants received a letter from Plaintiff providing notice that it intended to sue the Secretary and the Service for the failure to complete 12-month findings for the petitioned species at issue here. FWS_0021 to FWS_0025. The Service responded to Plaintiff's letter on January 31, 2020. FWS_0026 to FWS_0027.

## II.   The Service Is Diligently Working Toward Completing Listing Determinations In Accordance With Its National Listing Workplan.

Since receiving the petitions at issue here, the Service has worked diligently to collect necessary information for the Rio Grande sucker and the Rio Grande, sicklefin, and sturgeon chubs, and has engaged in multiple conservation planning and implementation efforts. See, e.g., Becker Decl. ¶¶ 9-10; Sartorius Decl ¶ 6. The Service has also made steady progress on the work listed in its Workplan.

The current Workplan includes 150 12-month findings and 10 proposed listing rules and proposed critical habitat rules for FY2021 through FY2023. Frazer Decl. ¶ 30. The 12-month findings for the four species at issue here have been assigned to the Service's Southwest and Mountain-Prairie Regions. Becker Decl. ¶ 2; Sartorius Decl. ¶ 2. The Service's Southwest Region is currently working on 12-month findings (and potential associated rulemakings) for 46 species, proposed listing rules with critical habitat for eight species, final critical habitat rules for four species, and final listing and critical habitat rules for two species through FY2023. Frazer Decl. ¶ 28. The Mountain-Prairie Region is currently working on 12-month findings for 17 species, one proposed listing and critical habitat rule, and final listing and critical habitat rules for 3 species that are scheduled to conclude in FY2021 through FY2023. Frazer Decl. ¶ 28. The current Workplan categorizes the sicklefin and sturgeon chubs as bin 3 species, and projects that the Service will complete the 12-month listing decisions by the end of FY2023. Frazer Decl. ¶ 31; Becker Decl. ¶ 9. While 12-month findings for the Rio Grande chub and sucker are not included in the current Workplan, the Service has assigned these species to bin 4, and projects that it will complete the 12-month findings by the end of FY2024. Frazer Decl. ¶ 31; Sartius Decl. ¶ 8.

## LEGAL STANDARD

This action is brought under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. § 706. The ESA's citizen-suit provision authorizes a private party to sue "where there is alleged a failure of the Secretary to perform any act or duty under section 1533

of this title which is not discretionary." 16 U.S.C. § 1540(g)(1)(C). The lawsuit must "compel [the Secretary] to perform a nondiscretionary duty under § 1533." *See Bennett v. Spear*, 520 U.S. 154, 173 (1997). Likewise, the APA allows courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Such a claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original).

Plaintiff's claim that the Secretary has failed to comply with the ESA is reviewed under the standards of review provided in the APA. *Las Vegas v. Lujan*, 891 F.2d 927, 932 (D.C.Cir.1989); *see also Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011). Under the APA, "[s]ummary judgment is an appropriate procedure for resolving a challenge" to a federal agency's actions. *Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995), *amended*, 967 F. Supp. 6 (D.D.C. 1997)). When considering a summary judgment motion, the district court "sits as an appellate tribunal" and "the entire case . . . is a question of law." *Am. Bioscience v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

## ARGUMENT

The Service does not dispute that the ESA imposes a statutory obligation on it to make a timely 12-month finding, *see* 16 U.S.C. § 1533(b)(3)(B), and that it has missed this deadline for each species at issue here. Accordingly, the Service does not oppose a remedy directing it to make 12-month findings by a reasonable and feasible date set by the Court. But Defendants oppose the remedy sought by Plaintiff.

The remedy proposed by the Service is the most feasible and most consistent with the ESA's conservation goals, the Service's Workplan and the ESA, and present and anticipated funding levels of the ESA listing program. Plaintiff's proposed remedy is not feasible; would upend the Service's efforts to bring order, predictability, and efficiency to the listing program; and fails to account for the time required for the necessary scientific work as well as the

necessary legal and policy reviews. Put simply, only the remedy proposed by Defendants provides enough latitude for the Service to integrate the demands posed by Plaintiff's listing petitions into an already taxing workload that is limited by the funding provided by Congress, maintains the careful balance the Service has fashioned for its ESA listing program, and allows sufficient time to complete thorough and defensible findings based on the best available information.

## I.   The Court Has Discretion To Fashion Equitable Injunctive Relief.

### A.   Courts have broad discretion when an agency fails to act by a statutory deadline.

There is no question that this Court has discretion to enter the remedy requested by the Service.[8] In a suit alleging violation of a congressionally mandated duty, a district court exercises its discretion to fashion a remedy by considering whether "the official involved . . . has in good faith employed the utmost diligence in discharging his statutory responsibilities." *Nat. Res. Def. Council v. Train ("Train")*, 510 F.2d 692, 713 (D.C. Cir. 1975). "The sound discretion of [a] . . . court does not embrace enforcement . . . of a party's duty to comply with an order that calls [on] him 'to do an impossibility.'" *Id.* (citation omitted). Indeed, "it would be inappropriate to set an infeasible schedule in order to punish a delinquent agency." *Sierra Club v. Thomas*, 658 F. Supp. 165, 172 (N.D. Cal. 1987) (citation omitted). Consequently, a statutory deadline should not be enforced to the extent that it is impossible or infeasible to comply with such a deadline. *Am. Lung Ass'n v. Browner*, 884 F. Supp. 345, 347 (D. Ariz. 1994).

In *Train*, the leading case on the subject of an agency's failure to meet statutory deadlines, the D.C. Circuit recognized two types of circumstances that might necessarily

---

[8] Indeed, even though Defendants do not advance the argument here, numerous courts have held that a missed statutory deadline does not compel the Court to automatically issue injunctive relief. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-13 (1982); *W. Coal Traffic League v. Surface Transp. Bd.*, 216 F.3d 1168, 1174-75 (D.C. Cir. 2000); *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991); *Mylan Pharms. v. Shalala*, 81 F. Supp. 2d 30, 47 (D.D.C. 2000); *In re Sw. Rsch. & Info. Ctr.*, No. 95-1285, 1995 WL 495948, at *1 (D.C. Cir. Aug. 14, 1995).

delay agency action and make it infeasible to comply with a particular deadline: (1) budgetary and manpower constraints, and (2) the need for an agency to have more time to sufficiently evaluate complex technical and scientific issues. 510 F.2d at 712-13. With respect to the latter, "[t]he public has a significant interest in ensuring that the government does not [act] via a process that emphasizes expediency over quality and accuracy." *Cronin v. Browner*, 90 F. Supp. 2d 364, 373 (S.D.N.Y. 2000) (citation omitted). In setting deadlines, courts have considered the agency's need for time to act in a manner that would withstand the scrutiny of subsequent challenge. *See Sierra Club v. Thomas*, 828 F.2d 783, 798-99 (D.C. Cir. 1987); *United Steelworkers of Am. v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986) (per curiam) (holding judicial imposition of overly hasty timetable on agency would ill serve the public interest); *Maine Ass'n of Handicapped Persons v. Dole*, 623 F. Supp. 920, 926 (D. Me. 1985) (recognizing "the need to implement clear and effective regulations capable of withstanding the scrutiny of challenges following enactment").

In short, when an agency has missed a statutory deadline, a court should examine the relevant facts and circumstances, and evaluate the time frame needed by the agency to make a well-reasoned, scientifically supportable, and defensible decision.

### B.   The ESA does not constrain the Court's discretion.

The discretion of the Court in fashioning a remedy is quite broad unless a statute provides otherwise in a "clear and valid legislative command." *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496-97 (2001) (citation omitted). The Supreme Court has also noted that in cases where a court is asked to enforce a statutory deadline, "the question before us concerns the consequences of the missed deadline where, as here, the statute does not specify them." *Dolan v. United States*, 560 U.S. 605, 610 (2010). The ESA's citizen-suit provision, which is the jurisdictional basis for Plaintiff's 12-month-finding claim, does not clearly specify the consequences of a missed deadline. 16 U.S.C. § 1540(g)(1)(C) (providing district courts with the authority "to order the Secretary to perform [an] act or duty [under section 4 which is not discretionary with the Secretary]" but not mandating the

12

timeframe within which the Secretary must perform such act or duty). Specifically, "'Congress did not limit district courts' authority to provide equitable relief under the ESA, and indeed, specifically reserved their traditional authority to fashion appropriate equitable relief.'" *Colo. River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 178 (D.D.C. 2006) (quoting *Defs. of Wildlife v. Norton*, 239 F. Supp. 2d 9, 25 (D.D.C. 2002), *vacated in part on other grounds*, 89 F. App'x 273 (D.C. Cir. 2004); 16 U.S.C. § 1540(g)(5)).[9]

## II.     The Remedy Proposed By The Service Best Preserves The Benefits Of Its Workplan And Best Serves The ESA's Conservation Goals.

The Supreme Court has noted that in cases where a court is asked to enforce a statutory deadline, a court should look "to statutory language, to the relevant context, and to what they reveal about the purposes that a time limit is designed to serve." *Dolan*, 560 U.S. at 610. In terms of the language and purposes of the ESA and the relevant context, the Service's Workplan represents a careful and balanced approach—developed and implemented over two administrations—that addresses the Service's ongoing obligations for listing decisions under the ESA within the funding limitations imposed by Congress. Plaintiff's proposed remedy cannot be carried out without disrupting this balance, setting back higher priority listing actions, and producing rushed and sloppy decisions. At bottom, Plaintiff's demand is at odds with the very purposes of the ESA that the listing deadlines are supposed to serve.

### A.     The Service's Workplan advances the conservation goals of the ESA.

The primary purpose of the ESA is to conserve threatened and endangered species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b). However, species do not fall within the substantive protections of the ESA until they are listed as threatened or endangered. *See id.* §§ 1533(d), 1536, 1538; *see also Tennessee Valley Auth. (TVA) v. Hill*, 437

---

[9] And in fact, other courts have exercised their discretion when fashioning an appropriate remedy in ESA cases. *See, e.g.*, *Ctr. for Biological Diversity v. BLM*, No. C 03-2509 SI, 2006 WL 2788252, at *2 (N.D. Cal. Sept. 26, 2006); *Contoski v. Scarlett*, No. 05-2528 (JRT/RLE), 2006 WL 2331180, at *4 (D. Minn. Aug. 10, 2006); *Ctr. for Biological Diversity v. Norton*, No. 01-CV-2101-IEGLAB, 2003 WL 22225620, at *4 (S.D. Cal. Sept. 9, 2003).

U.S. 153, 180 (1978). And so, statutory deadlines on listing petitions were added to the ESA out of a concern that "status reviews have often continued indefinitely," and were intended to "force action on listing and delisting proposals." H.R. Rep. No. 97-835, at 21 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 2862. The Service's Workplan (and its predecessor, the Multi-District Litigation Settlement Agreement ("MDL Agreement"), *see* Frazer Decl. ¶ 12) arose out of a widespread recognition that the system was failing to produce timely protections for species in spite of Congress's efforts to build mandatory deadlines into the process. A growing dual backlog of petition findings and candidate species precluded the Service from responding in a timely way to petitions at the beginning of the listing process, and also consumed the resources that might have been used for completing proposed and final listing rules at the end of the listing process.

For example, between 2007 and 2010, the Service received many multi-species petitions seeking the listing of 1,187 species. Frazer Decl. ¶ 12. Then, between 2009 and 2010, many lawsuits were filed seeking to enforce nearly 800 listing petition deadlines. Frazer Decl. ¶ 12. These petitions and lawsuits tipped the system far out-of-balance. As the petitions were filed, and lawsuits were pressed, the Service was required to devote more and more of its limited listing program resources to meeting deadlines on petition findings, thereby limiting the amount of funding left to address candidate species—species that had already been found to warrant listing but for which development of a proposed listing rule is precluded by higher-priority listing actions. *See, e.g., 2010 Candidate Notice of Review*, 75 Fed. Reg. 69,222, 69,224 (Nov. 10, 2010). In fact, by the end of 2010, 251 candidate species had been found to warrant listing and were still awaiting proposed listing rules. *Id*.

Although the Service attempted to set priorities, address mandatory and court-enforced deadlines, and (as resources allowed) pursue work on the higher-priority candidate species, the same plaintiffs whose lawsuits seeking to enforce petition deadlines led to court orders or settlement agreements that left the Service with little funding for addressing candidate species also brought lawsuits charging that the Service was not making sufficient

"expeditious progress" in addressing the candidate-species list. *See, e.g.*, Third Amended Compl., *Ctr. for Biological Diversity v. Norton*, No. 1:04-cv-02026 (GK) (D.D.C., Nov. 7, 2005) (alleging the Service violated the ESA because it was "making virtually no progress at all in adding concededly qualified species to the lists"). The Service was only able to restore balance to its listing program by entering into the MDL Agreement, which provided for the Service to address the status of the 251 candidate species and complete a number of petition findings and other listing and critical habitat actions in exchange for plaintiffs' agreement to bring new petitions and deadline lawsuits almost to a standstill. *See In re Endangered Species Act Section 4 Deadline Litig.*, No. 10-377 (EGS), MDL Docket No. 2165, Docs. 31-1 (May 10, 2011) and 42-1 (July 12, 2011).

The Service's current Workplan continues the momentum and significant progress of its MDL Agreement predecessors, and seeks to maintain balance at both ends of the Service's listing process—initial petition findings and proposed and final listing/critical habitat rules (including for candidate species)—while allowing sufficient time for thorough and robust decisions. Frazer Decl. ¶¶ 12-13, 15-17, 20. To be sure, the MDL Agreements and the Workplan have provided the Service with the respite and resources needed to significantly reduce the backlog of candidate species. *See 2019 Candidate Notice of Review*, 84 Fed. Reg. 54,732, 54,734 (Oct. 10, 2019). Indeed, the Service's list of candidate species has shrunk from 251 in 2010 to 41 in October 2019. *Compare* 75 Fed. Reg. 69,224 *with* 84 Fed. Reg. 54,734.

The Service set its priorities in the current Workplan based in part on its Prioritization Methodology, which was published in the *Federal Register* for public comment. The Service cannot maintain the Workplan's balancing if it must devote disproportionate funding and staffing resources to making 90-day and 12-month petition findings, which are only the initial steps in the process and alone do not result in the listing of species and attendant extension of protections under the ESA. Frazer Decl. ¶ 18. The Workplan allows the Service to allocate its limited resources appropriately so that the litigation-driven deadlines for petition findings do not again overwhelm the need for rulemakings to determine whether to list the many

species already found to warrant the protections of the ESA. Frazer Decl. ¶ 18. In pursuit of that balance, the Service considers the outstanding listing workload and the relative priorities of each of the outstanding actions; allocates its listing budget to the regions in light of the percentage of the highest-priority workload that falls within that region; and then identifies in the Workplan the actions that the Service anticipates it will be able to complete each year. Frazer Decl. ¶¶ 9, 18-19, 31. Under the current Workplan, the Southwest and Mountain-Prairie Regions need to complete 63 12-month findings, discretionary status reviews, and court ordered actions before the end of FY2023. Frazer Decl. ¶ 28.

**B.    Plaintiff's proposed remedy undermines the conservation goals of the Service's Workplan and the ESA.**

Plaintiff asks this Court to require the Service to publish 12-month findings for all four aquatic species within nine months of the close of briefing on the parties' motions. That deadline is, for all purposes, impracticable. Putting aside the fact that Plaintiff's remedy makes no accommodation for the Court's own workload or the time the Court will need to decide this matter, and the fact that publication of a 12-month finding is beyond the Service's control, Becker Decl. ¶ 32, the proposed remedy is impossible to achieve without the reallocation of resources away from the priorities identified in the current Workplan, including work on listing for candidate species. *See* Frazer Decl. ¶¶ 18, 22. For this reason, Plaintiff's proposal is effectively an effort to impose its value judgments on the Service about how the Service should use its limited resources to meet the listing programs' statutory requirements.

By setting deadlines, Congress made it clear that timely petition findings were important. Congress also recognized, however, that the system could be overloaded, and directed the Service to "utilize a scientifically based priority system to list and delist species, subspecies, and populations based on the degree of threat, and proceed in an efficient and timely manner." H.R. Rep. No. 97-835, at 21 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 2862. Hence, Congress acknowledged the possibility that for some petitions, "the existence of pending or imminent proposals to list species subject to a greater degree of threat would make

allocation of resources to such a petition unwise." *Id.* Moreover, through annual spending caps on the listing program, Congress imposed limits on the resources that the Service could expend on the listing program. Frazer Decl. ¶¶ 4-8. Thus, because the Service is not able to do all the work required by the statute, it developed a comprehensive system to prioritize the work of its listing program. Frazer Decl. ¶¶ 8, 15-16, 18, 20. The current Workplan's attempt to maintain balance and order in the system is therefore consistent with Congressional objectives.

Plaintiff's proposed remedy would undermine the goals and balance of the Workplan. The carefully considered Workplan spreads out numerous deadlines until FY2023. Frazer Decl. ¶¶ 20. Twelve-month findings require expenditure of significant resources. Frazer Decl. ¶ 9 (explaining how the Service allocates funds to its offices for use on listing program activities). If ordered to complete 12-month findings on all four species and publish those findings by October 8, 2021, as Plaintiff requests, the Service would have to immediately reprioritize its carefully planned workload. Frazer Decl. ¶ 18, 20.

This would be problematic for at least four reasons. First, the Service does not anticipate having available funding or staff resources to add these 12-month findings to its FY2021 planned workload. Frazer Decl. ¶¶ 4-8, 22. Second, imposition of new deadlines in FY2021, without providing additional resources needed to complete this work, would require the Service to delay work on other high-priority obligations in the Workplan. Frazer Decl. ¶¶ 20, 23. Third, Plaintiffs' proposed remedy would require a rushed decision that might not allow adequate time to gather and analyze the required science and data, and prepare a thorough and defensible status assessment for each species. Becker Decl. ¶¶ 17 (estimating that the collection and assessment of information about the sicklefin and sturgeon chubs will take about 18 months); Sartorius Decl. ¶ 9 (estimating that the collection and assessment of information about the Rio Grande chub and sucker will take at least 12 months). Fourth, Plaintiff's proposed remedy makes no accommodation for the time necessary to obtain peer review of the Service's analysis of the information collected about each species, and might

17

deny the Service Director and the Department of the Interior sufficient time to undertake their substantive and legal review of the proposed 12-month findings. Becker Decl. ¶¶ 18 (the peer review process requires about 2 months to complete), 32 (the staff review and clearance process for proposed findings takes at least three months); Sartorius Decl. ¶ 14 (review and clearance will require at least three months).

### C. As articulated in *Train*, courts recognize that it may be infeasible for the Service to comply with a statutory listing deadline.

Although Plaintiff contends that "underfunding cannot excuse" the Service from complying with the ESA's listing deadlines, Pls. Mot. at 22-24, it is well established in this Circuit that budgetary constraints is, in fact, a circumstance in which it might be necessary to delay agency action. *See Train*, 510 F.2d at 712-13. Furthermore, Plaintiff's cramped reading of the ESA and the Service's Workplan not only ignores the Service's other listing obligations, but would also strip the Service of any discretion it has to balance its resources with the competing conservation needs of hundreds of other species.

Courts have recognized the Service's impossible task of balancing these responsibilities on a shoestring budget. *See, e.g.*, *Cal. Native Plant Soc'y v. Norton*, No. Civ. A. 03-1540 (JR), 2005 WL 768444, at *7 (D.D.C. Mar. 24, 2005) ("Stripped to their essence, [the Service's] basic explanations for why listing the Spineflower and other species was warranted but precluded were that FWS had statutorily mandated deadlines, court-ordered actions, higher priority listing activities, and a very limited budget. Despite protests from the plaintiffs, all of these explanations are legitimate."); *cf Coos Cty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 808 (9th Cir. 2008) (noting the Service "enjoys considerable scheduling discretion in the management of listing and research priorities"); *Friends of Wild Swan v. U.S. Fish & Wildlife Serv.*, 945 F. Supp. 1388, 1401 (D. Or. 1996) (recognizing that a "lack of funds, when Congress expressly prohibits expenditures for listing species, can excusably delay mandatory listing determinations.") (citation omitted); *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir.1998) (finding that Secretary had adequately demonstrated impracticability of

18

issuing 90–day preliminary finding due to Congressional funding moratorium); *Env't Def. Ctr. v. Babbitt*, 73 F.3d 867, 872 (9th Cir.1995) (finding that Secretary failed to comply with nondiscretionary duty to make 12–month finding, but excusing compliance until appropriated funds from Congress were available).

Rather than acknowledging the holdings in these cases, Plaintiff relies heavily, if not exclusively, on a decision in *American Lands Alliance v. Norton*, 242 F. Supp. 2d 1, *vacated in part on reconsideration*, 360 F. Supp. 2d 1 (D.D.C. 2003). Pls.' Mot. at 15-17, 21, 23-24. In that decision, the court vacated the Service's former Petition Management Guidance (the "PM Guidance"), which treated public listing petitions as "redundant" if a species had already been placed on the Service's candidate list pursuant to an internal agency procedure. *See Am. Lands All.*, 242 F. Supp. 2d at 12-15. The Court found that the Service's reliance on its internal procedure violated the "notice and comment" requirement in 16 U.S.C. § 1533(h), and that the PM Guidance was facially invalid because it allowed the Service to avoid the ESA's non-discretionary obligation to issue a 12-month finding. *See id.* at 12-15, 16-18.

But the Service's current Workplan and Prioritization Methodology are not like the prior PM Guidance. Unlike the PM Guidance, the Prioritization Methodology at issue here was subject to a notice and comment process. 81 Fed. Reg. 49,248. Thus, the *American Lands Alliance*'s holding concerning the procedural violation of the ESA is inapplicable. *See* 242 F. Supp. 2d at 12-15. The Workplan and Prioritization Methodology differ substantively as well. The former PM Guidance treated petitions to list species that had already been identified by the Service as a "candidate for listing under the ESA" as a redundant second petition. *Id.* at 15. The Court set aside the PM Guidance because, by treating petitions as redundant, the policy permitted the Service to make a "warranted but precluded" finding without complying with the ESA's requirement to publish such finding in the Federal Register. *See* 242 F. Supp. 2d at 17. Unlike the PM Guidance, the Workplan and Prioritization Methodology do not treat petitions as redundant—they prioritize work (and therefore recognize the requirement for a 12-month finding) using a scientifically based system so that the Service can complete

its listing obligations as efficiently as possible. Moreover, unlike the PM Guidance, the Service does not pre-judge the outcome of the petition findings that are prioritized in the Workplan. *See* Frazer Decl. ¶ 22.

*American Lands Alliance* is distinguishable for another, more fundamental, reason: it in no way addresses the consequences of the congressionally mandated spending caps on the Service's listing program.[10] As we demonstrate below in Part III, Congress has, for many years, placed caps in appropriations legislation that limit the amount of funds that can be expended on the Service's listing program. The Service cannot ignore appropriations caps imposed by Congress. The dispute here is controlled by principles articulated in *Train*, not *American Lands Alliance*.

### D.   The Court has discretion to set a feasible remedy that preserves the Workplan's schedule and its ordering of priorities.

The Service is not arguing that the Court should refrain from ordering the Service to submit to the Office of the Federal Register 12-month findings for each species by a date certain. Rather, the Service is asking the Court to recognize the orderly process that it has developed to prioritize the many outstanding 12-month findings.

Statutory deadlines do not require a reviewing court to blindly advance whatever priority happens to be the subject of a lawsuit without considering the broader context. In considering the remedy for a missed statutory deadline, "the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities." *In re Barr Labs.*, 930 F.2d at 74 (citing *In re Monroe Commc'ns Corp.*, 840 F.2d 942, 946 (D.C. Cir. 1988). Courts determining whether to enforce a statutory deadline have therefore considered "the effect of expediting delayed action on agency activities of a higher or competing priority." *Telecomms. Rsch. Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (citations omitted). In setting compliance timeframes for an

---

[10] *Biodiversity Legal Found. v. Babbitt*, 63 F. Supp. 2d 31 (D.D.C. 1999), cited at Pls.' Mot. at 15, 17, 22, 28-29, is also distinguishable for this reason.

agency, courts should recognize when "it is possible that budgetary commitments and manpower demands required to [comply with a statutory deadline] are beyond the agency's capacity or would unduly jeopardize the implementation of other essential programs." *Train*, 510 F.2d 712.

Here, the existing schedule reflects careful consideration by the agency of its resources and capabilities, and is also the product of many months of internal deliberation and decision-making. Frazer Decl. ¶¶ 15-20. Reordering the Service's Workplan to immediately complete work on Plaintiff's preferred species would simply move these particular 12-month findings ahead of findings for numerous other species, including proposed listing rules for 15 candidate species. *See* Frazer Decl. ¶¶ 20-22. Consequently, requiring the Service to immediately complete work on 12-month findings for these four species in the absence of any emergency and without additional resources would divert work from candidate species that the Service has committed as part of its balanced approach to dealing both with petitions and with candidates already found to warrant listing. Frazer Decl. ¶¶ 23.

### E.    The Service is not delaying 12-month findings because of recent regulatory changes.

Plaintiff incorrectly asserts that the Service is delaying 12-month findings based on recent changes to its implementation of ESA Section 4. *See Endangered and Threatened Wildlife and Plants; Regulations for Listing Species and Designating Critical Habitat*, 84 Fed. Reg. 45,020, 45,023-24 (Aug. 27, 2019). Plaintiff offers no evidence to support this assertion. Nor could it. In that rulemaking, the Service made clear that changes concerning the compilation of economic data would not affect the requirement that listing determinations be made solely on the basis of the best scientific and commercial data available, or the Service's "inten[t] to comply with statutory, court-ordered, and settlement agreement timelines for classification determinations." 84 Fed. Reg. 45,026.

Further, that the Service may change the priority of a particular finding listed in the Workplan, or a particular finding might take longer to complete than planned, is not evidence

that the Workplan is not working or a sham. The Workplan, like any planning document, requires periodic updates to incorporate new petitions and new information, resulting in changes in priority to some actions. Frazer Decl. ¶¶ 24-25. Plaintiff's contentions to the contrary are simply policy disagreements and should be discounted as such.

## III.   The Service Cannot Disregard Congressionally Imposed Appropriations Caps.

Instead of advancing reasons why these four species should be moved to the top of the Service's workload—before work that the Service has determined is more urgent—Plaintiff argues that the Service's backlog is due to "self-inflicted budgetary constraints" and the shifting of resources to delisting and down-listing species. Pls.' Mot. at 22-24, 25,27. These arguments are fundamentally flawed.

### A.   Congress places annual caps on the Service's ESA listing program.

First, Plaintiff fails to acknowledge that Congress has placed spending caps on the Service's ESA listing program. Congress—not the Service—is responsible for authorizing the expenditure of public monies and laws that ultimately appropriate those monies. *United States House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 58 (D.D.C. 2015). "Authorization and appropriation by Congress are nonnegotiable prerequisites to government spending." *Id.* (quoting U.S. Const. art. I, § 9, cl. 7). Appropriations legislation provides legal authority for federal agencies to incur obligations and to make payments out of the Treasury for specified purposes. *Id.* Appropriations legislation has "the limited and specific purpose of providing funds for authorized programs." *Andrus v. Sierra Club*, 442 U.S. 347, 361 (1979) (quoting *TVA*, 437 U.S. at 190). And while an agency may request funding through budget submissions to Congressional committees, it is Congress alone that determines the amount of appropriations. *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (noting the Appropriations Clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress" (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

Second, Congress may, if it so chooses, place a cap in appropriations legislation limiting the amount of federal money that can be expended on a particular program or for a particular purpose, regardless of other statutory obligations. *See, e.g.*, *Adams v. United States*, 141 Fed. Cl. 428, 432-33 (2019) (describing annual appropriations caps on the amount of overtime pay that a customs employee could receive notwithstanding the requirements of the Fair Labor Standards Act). And Congress may even amend pre-existing statutory obligations through appropriations legislation if its intent to do so is clear. *United States v. Will*, 449 U.S. 200, 221-22 (1980) (quoting *United States v. Dickerson*, 310 U.S. 554, 555 (1940)). It is also well-established that the plain language of an appropriations action, coupled with the legislative history, is evidence of Congress's intent. *Will*, 449 U.S. at 221-22.

The text of the appropriations caps here demonstrates Congress's clear intent to limit the expenditure of funds for the Service's ESA listing program. Since at least 1997, Congress has included a proviso in the appropriations for the Service's primary source of funding, the Resource Management account, that controls the funds available for use in the Service's listing program. *See* Exh. D, Table of Excerpts from Appropriations Legislation for F2014 through FY2020; *Omnibus Consolidated Appropriations*, Pub. L. No. 105-277, 112 Stat. 2681 (1998); *Dep't of the Interior and Related Agencies Appropriations Act, 1998*, Pub. L. No. 105-83, 11 Stat. 1543, 1547 (1997). Thus, while Congress provides a lump sum for the Service's operations, it restricts expenditures from that appropriation using a phrase that begins "*Provided*, That not to exceed . . . ." *See, e.g.*, Exh. D. The use of that phrase demonstrates Congress's clear intent to impose a cap on the total funds available for the listing program. *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 202-03 (2012) (Roberts, C.J., dissenting) (quoting 2 General Accounting Office, *Principles of Federal Appropriations Law*, 6-8 (2d ed. 1992) ("[T]he most effective way to establish a maximum . . . earmark is by the words 'not to exceed' or 'not more than'").

Additionally, the committee reports for the 1998 and 1999 fiscal year budgets leave no doubt that Congress intended to impose precise funding limits on the listing program by

enacting spending caps. H.R. Rep. No. 105-337, at 56 (1997), *reprinted in* 1997 U.S.C.C.A.N. 2186, 2191 ("As requested by the Department of the Interior the managers reluctantly have agreed to limit statutorily the funds for the endangered species listing program."); H.R. Rep. No. 105-825, at 1187 (1998) ("The conference agreement includes bill language earmarking the Endangered Species Act listing program at $5,756,000 . . . .").[11] Thus, notwithstanding the Service's duty under Section 4 of the ESA to complete 12-month findings within a year of receipt of a petition, Congress has clearly imposed annual limits on the funds available to implement the ESA listing program.

### B.    The Service expends funds on the ESA listing program in accordance with Congress's direction.

Despite Plaintiff's belief to the contrary, Pls.' Mot. at 25-27, Defendants are not robbing-Peter-to-pay-Paul. Rather, Defendants are expending appropriated funds in accordance with the direction of Congress. In recent years, Congress chose to specifically carve the programs that Plaintiff identified in its brief (*i.e.*, five year reviews, as well as actions concerning de-listing and down-listing species under ESA Section 4(c)(2)) from the appropriations cap imposed on the Service's listing program. *See, e.g.*, *Further Consolidated Appropriations Act, 2020*, Pub. .L. No. 116-94, 133 Stat. 2534, 2689 (2019) (specifically removing the "processing petitions, developing and issuing proposed and final regulations, and taking any other steps to implement actions described in subsection (c)(2)(A), (c)(2)(B)(i), or (c)(2)(B)(ii)" of Section 4 of the ESA from the cap). Plaintiff is therefore wrong to suggest the Service's funding of, and action on, de-listing and down-listing determinations shifts funds that could otherwise be spent on the listing program. The funding for these activities is separate.

---

[11] Congress reportedly enacted appropriations caps on the listing program in the 1990s after the "Department of the Interior and its appropriators in Congress realized that there was a distinct possibility that [the Service] would face a combination of court orders with which it would be impossible to comply without violating the budget allocations in the committee reports." Jesup, *supra*, at 350.

And the premise of Plaintiff's argument is wrong. The Service cannot just allocate more funds to the listing program because an agency cannot use a more general appropriation to increase a specific appropriation. *See Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (applying the general-specific cannon to appropriations legislation). Consequently, the Service could not, as Plaintiff implies, expend more on the listing program than the amount specified by Congress.

In sum, Plaintiff's disagreements with the Service's activities outside of the listing program are of no significance here. As long as the agency complies with the constraints imposed by Congress—as the Service has done—it may exercise its discretion to fund programs as necessary "to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (citations omitted). The Court should therefore give no weight to Plaintiff's policy judgments regarding the various other programs funded from the Service's general appropriations.

### C.   Plaintiff's attempt to use this court's equitable powers to circumvent the listing program's spending cap should be rejected.

Plaintiff's proposed remedy should also be rejected because court-imposed deadlines could eventually raise significant separation-of-powers concerns in the broader context in ESA Section 4 deadline litigation. There is a long history of litigants in ESA Section 4 deadline cases—including the Plaintiff in this case—filing large, multi-claim deadline lawsuits covering hundreds of species. [12] *See* Jesup, *supra*, at 343, 370-77 (describing listing litigation in the 1990s and the MDL litigation); Frazer Decl. ¶ 13. These litigation tactics not only disrupt the balance that the Service has strived to implement for its listing program, but they also raise

---

[12] There is, in fact, an ESA Section 4 deadline suit currently pending in this Court in which the plaintiffs have asked the Court to direct the Service to complete listing findings for more than 240 species. *See Ctr. for Biological Diversity v. Bernhardt, et al.*, No. 1:20-cv-00573-EGS (D.D.C.).

serious separation-of-powers concerns when considered for what they ultimately are: an end-run around Congressional spending limits.

Courts are reluctant to use equitable principles to require agencies to expend funds that Congress has not authorized. For example, in *Office of Personnel Management v. Richmond*, a retired naval employee argued that the government should be equitably estopped from denying him disability benefits because of erroneous advice given to him by a government employee. 496 U.S. at 418. The Court rejected this argument, concluding that the equitable doctrine of estoppel could not override the clear command of the Appropriations Clause. *See id.* at 426 (quoting *INS v. Pangilinan*, 486 U.S. 875, 883 (1988)). In reaching this conclusion, the Court reasoned, in part, that the use of equity to expend unauthorized funds undermined the fundamental and comprehensive purpose of the Appropriations Clause: "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Id.* at 428.

So too here. Like the estoppel claim in *Richmond*, Plaintiff's request for the Court to compel the Service in equity to expend additional funds on the listing program is one step down the path toward "render[ing] the Appropriations Clause a nullity." *Id.* Litigants like Plaintiff, which is plainly "displeased with a [] restriction . . . imposed by Congress to ease burdens on the fisc," could simply seek to evade such restrictions by resorting to the equitable powers of the Court in one case after another. *See id.* Through the sheer mass of lawsuits and claims (which, of course, is a tactic that has been used by Plaintiff in ESA Section 4 deadline cases in the past), litigants could effectively "nullify a congressional decision" to cap funding for the ESA listing program. *See id.* at 429-30. Put simply, when viewed in the broader context of these cases, Plaintiff's request for this Court to use its equitable powers to direct a remedy raises the possibility of serious separation-of-powers concerns.

IV.    **The Court Should Defer to the Service's Proposed Compliance Deadline.**

A.    **Plaintiff overstates the urgency for 12-month findings for the four freshwater aquatic species here.**

Plaintiff contends that its remedy is urgently needed for all four species in this case because the 12-month findings are long overdue. Pls.' Mot. at 29. But these species have only received 90-day findings determining that they "may" warrant ESA listing. Despite Plaintiff's belief to the contrary, such a determination at the 90-day finding stage is limited in scope to the contents of the petition and does not reflect a full review of the best available scientific information. *See W. Watersheds Project v. Norton*, No. CV 06-00127-S-EJL, 2007 WL 2827375, at *8 (D. Idaho Sept. 26, 2007). Every one of the 15 candidate species addressed by the Workplan—species that have already been found to warrant listing but for which development of a proposed listing rule is precluded by higher-priority listing actions—by contrast, has already been determined to meet the ESA listing criteria and to warrant listing as threatened or endangered based on the best scientific and commercial data available.

Plaintiff's proposed remedy would, in effect, set a higher priority on these particular 12-month findings than overdue 12-month findings for other species. As the Service strives to complete petition findings as close to within the statutory timelines as possible, the Workplan has already incorporated approximately 223 new petition findings. Frazer Decl. ¶ 21. These existing commitments involve petition findings that the Service has deemed more urgent than the four species at issue here. *See, e.g.*, FWS_0014 (categorizing the Mexican fawnsfoot and Salina mucket in bin 1—that is, critically imperiled—and scheduling 12-month findings for these species in FY2022); Frazer Decl. ¶ 20 (noting the Workplan includes 73 actions for FY2021).

Yet Plaintiff has presented no information to believe that the 12-month findings for these four aquatic species should have a higher priority than the numerous other species in the current Workplan. If Plaintiff believed that listing these species was urgently needed, then Plaintiff could have suggested in its petitions that the Service should consider emergency

listing these species. *See* 16 U.S.C. § 1533(b)(7); 50 C.F.R. § 424.20(a) (authorizing the Secretary to bypass normal rulemaking procedures and immediately list a species where it finds an "emergency posing a significant risk to the well-being of a species of fish, wildlife, or plant"). But Plaintiff did not do so. The fact that Plaintiff has never suggested that emergency listing is needed for these species belies its contention here that these species "urgently need the ESA's protections." Pls. Mot. at 29.

Furthermore, the particular circumstances surrounding the four species at issue here do not support Plaintiff's assertion that action is urgently needed. The Service has been monitoring the sicklefin and sturgeon chubs since the 1980s. Becker Decl. ¶ 5. After the Service issued status reports for these fish species in the early 1990s, it received a petition to list the species as endangered throughout their range. *See Endangered and Threatened Wildlife and Plants; 12-month Finding for a Petition To List the Sicklefin Chub (Macrhybopsis meeki) and the Sturgeon Chub (Macrhybopsis gelida) as Endangered*, 66 Fed. Reg. 19,910 (Apr. 18, 2001). Based in part on information developed from a change in sampling techniques, the Service concluded that sicklefin chub were "more widely distributed and more common than previously believed," and that the distribution of sturgeon chub was the same. *Id.* at 19,911-12. At that time, the Service considered the construction and operation of dams, as well as the channelization of the Missouri and Mississippi Rivers, to be the principle factors affecting sicklefin and sturgeon chub populations. *See id.* at 19,914. But despite the fact that the "threats posed by the dams and reservoirs have been in place for over 35 years," there were still "viable, self-sustaining populations of sicklefin and sturgeon chubs." *Id.* Hence, the Service found that listing the sicklefin and sturgeon chubs was not warranted. *Id.*

Plaintiff's own petition likewise identifies habitat fragmentation caused by damming and channelization to be "one of the most serious threats" to freshwater fish. FWS_0181. But Plaintiff identified no structure that was not in existence in 2001 when the Service made its prior not warranted 12-month finding. *See* FWS_0181 to FWS_0185 (discussing the treats posed by channelization and dams). And Plaintiff offers the Court no information why a 12-

month finding is urgently needed now even though the sicklefin and sturgeon chubs had successfully maintained self-sustaining populations more than 35 years after the fragmentation of their habitat by dams and channelization.

Plaintiff also ignores the conservation efforts that are being implemented to reduce threats and conserve the Rio Grande chub and sucker. Sartorius Decl. ¶ 6. In 2018, the Service entered into a conservation agreement with Colorado, New Mexico, and Texas, as well as several Indian Tribes and local municipal governments in these states, to identify and monitor wild populations of the Rio Grande species, restore populations to their native range, improve and restore habitat. Sartorius Decl. ¶ 6.

The Service recognizes that it is obligated to complete 12-month findings for these species but it has determined, based on the information available to it, that the listing program should complete other, more pressing actions first.

### B. Deference to an agency's proposed compliance deadline is appropriate where, as here, the service has been diligent.

Courts have consistently noted that "'[f]lexibility rather than rigidity' has distinguished equity jurisprudence," and that a "court may forebear the issuance of an order in those cases where it is convinced by the official involved that he has in good faith employed the utmost diligence in discharging his statutory responsibilities." *See Train*, 510 F.2d at 713 (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). The Court is "in essence, [] called on to separate justifications grounded in the purposes of the Act from the foot-dragging efforts of a delinquent agency." 510 F.3d at 713; *see also* H.R. Rep. No. 97-835, at 23 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 2863 (a court reviewing the Service's assertion of "expeditious progress" in the ESA listing program must "separate justifications grounded in the purposes of the act from the foot-dragging efforts of a delinquent agency").

The Service has been exerting the utmost diligence in carrying out its statutory responsibilities. For example, since FY2017, the Service has completed 15 90-day findings, 115 12-month findings (including 18 warranted and 97 not-warranted findings), 25 proposed

listing rules, 16 proposed critical habitat rules, 11 proposed listing and critical habitat rules, 22 final listing rules, 5 final critical habitat rules, and 5 final listing and critical habitat rules. Frazer Decl. ¶ 26. In the last two fiscal years alone, the Service has complete 12-month findings for 69 species, and published final listing rules for seven species, including final critical habitat designations for one species and final protective regulations under ESA Section 4(d) for two species. Frazer Decl. ¶ 27. The Service also published proposed rules for 20 species, including proposed critical habitat designations for 13 species and protective regulations under ESA Section 4(d) for 14 species. Frazer Decl. ¶ 27.

The Service has scheduled 150 12-month findings and 10 proposed listing rules and proposed critical habitat rules for FY2021 through FY2023 concurrent with the four 12-month findings at issue here, Frazer Decl. ¶ 30, and 73 actions in FY2021, including 12-month findings for 69 species, Frazer Decl. ¶ 20. The offices responsible for the 12-month findings at issue here are also diligently working on additional findings. The Southwest Region's listing workload currently includes 12-month findings for 46 species, proposed listing rules with critical habitat for 8 species, final critical habitat rules for four species, and final listing and critical habitat rules for two species through FY2023. Frazer Decl. ¶ 28. The Mountain-Prairie Region's listing workload currently includes 12-month findings for 17 species, proposed listing rules with critical habitat for one species, and final listing and critical habitat rules for three species through FY2023. Frazer Decl. ¶ 28.

The Service's commitments in its Workplan will require substantially all of the resources in the listing budget. Frazer Decl. ¶ 9. The Service intends to exert the utmost diligence in addressing the 12-month findings for the four species here. But it needs to be afforded sufficient time in which to slot in these obligations with its numerous other statutory and court-enforced obligations. The Service's request that it be allowed until the end of FY2023 to finalize 12-month findings for the sicklefin and sturgeon chubs, and to June 14, 2024, to finalize 12-month findings for the Rio Grande chub and sucker, does not reflect "the foot-dragging efforts of a delinquent agency," but rather a careful, realistic assessment of

30

capabilities and priorities that is fully "grounded in the purposes of the act." *See Train*, 510 F.2d at 713; *see also* H.R. Rep. No. 97-835, at 23 (1982), *reprinted at* 1982 U.S.C.C.A.N. at 2863. The Service should be accorded latitude to integrate additional workload, rather than compressing this additional finding into Plaintiff's proposed 9-month timeline. Otherwise, the Service will be forced to shift its well-reasoned priorities, destroy its goal of providing the public with predictability, and may produce a finding likely lacking in quality that may have to be revisited.[13]

## CONCLUSION

In sum, Plaintiff's motion should be denied, Defendants' cross-motion should be granted, and the Court should enter judgment directing the Service to submit to the Office of the Federal Register 12-month findings for the sicklefin and sturgeon chubs on or before September 30, 2023, and 12-month findings for the Rio Grande chub and sucker on or before June 14, 2024.

Dated:  November 16, 2020                    Respectfully submitted,

                                             JEAN E. WILLIAMS
                                             Deputy Assistant Attorney General

                                             SETH M. BARSKY
                                             Section Chief

                                             MEREDITH L. FLAX
                                             Assistant Section Chief

---

[13] In addition to the efforts described in this brief, the Service expects the Office of the Federal Register to publish the Service's 2020 Candidate Notice of Review soon. The 2020 Candidate Notice of Review will provide an updated list of plant and animal species that the Service regards as candidates for addition to the lists of endangered and threatened species, as well as the Service's findings on resubmitted petitions and a description of the Service's progress in revising the lists during the period October 1, 2018, through September 30, 2020.

_/s/  Robert M. Norway_
ROBERT M. NORWAY
D.C. Bar No. 490,715
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 307-1145
Facsimile: (202) 305-0275
Email:  robert.m.norway@usdoj.gov

_Counsel for Defendants_